Stanton A. Pepper v. Daisy Pickens

4627                                         431 S.W. 2d 247

Opinion Delivered September 9, 1968

*Leon Burrow* for appellant.

*Bruce Ivy and Gardner & Steinsiek* for appellee.

J. FRED JONES, Justice. Daisy Pickens brought suit against Stanton A. Pepper in Mississippi County Circuit Court, Chickasawba District, for personal injuries and property damage growing out of an automobile collision under a traffic light at the intersection of Tenth Street and Chickasawba Avenue in Blytheville, Arkansas. Pepper filed a counter-claim for damage to his automobile. A jury trial resulted in a verdict and judgment thereon, in favor of Daisy Pickens for $5,000, and on appeal to this court Petter relies upon the following points for reversal or modification:

"1. The verdict of the jury, in the amount of $5,000.00, is entirely without basis in evidence, and is excessive to the point to shock the conscience of the court; and the court erred in failing to grant a new trial or to order a remittitur.

"2. The verdict was against the law.

"3. The verdict was against the evidence.

"4. The verdict was against both the law and the evidence.

"5. The verdict was not sustained by sufficient evidence.

"6. The verdict was clearly against the preponderance of the evidence."

Point 1 includes the others and is the only point argued by the appellant. The facts, as to liability, must be gleaned from the conflicting evidence that usually attends an intersection collision. Both parties to the action contend that the other ran the red light.

Pickens testified that she had started home from work and that the light was green when she drove into the intersection on Tenth Street; that Pepper entered the intersection on Chickasawba Avenue at a high speed, and in violation of the traffic signal, ran the front of his automobile into the side of her automobile.

Pepper testified that he was driving slowly on Chickasawba Avenue waiting for the traffic light at Tenth Street to turn green; that when the light did change to green he drove into the intersection and seeing the Pickens automobile bearing down upon him in the middle of Tenth Street, he locked all the wheels on his automobile and was stopped when the side of the Pickens automobile struck the front of his automobile and damaged it.

The physical evidence is undisputed that the impact damage was to the side of the Pickens automobile and to the front of the Pepper automobile. It was stipulated between the parties at the trial, that the damage to the Pepper automobile amounted to $412.52, and the damage to the Pickens automobile amounted to $745.00.

Mary Ocheltree testified that she was driving a pickup truck behind the Pepper automobile and saw him run the red light and strike the Pickens automobile. She testified that Mr. Pepper left the scene of the accident and that she followed him, took his license number. and reported the accident to the police.

Mr. Pepper testified that he had started across Tenth Street enroute to a tractor agency to purchase some tractor parts, but the impact of the collision forced the radiator of his automobile into the fan and the screeching noise occasioned thereby, together with the fact that he couldn't open the doors of his automobile, irritated and un-nerved him to the extent that he turned on Tenth Street, drove several blocks, turned again and drove his automobile home. He testified that he intended to report the accident to the police, but that before he got around to calling the police, the police called him.

Three sisters, who had a friend living on Pepper's farm, testified that they were in an automobile on Tenth Street waiting for the light at the intersection to change from red to green; that Pickens was driving her automobile in the center of Tenth Street meeting them, and that before the light changed to green, Pickens drove her automobile into the intersection in violation of the traffic signal and collided with the Pepper automobile.

The jury chose to believe Pickens and her witness, and the jury verdict on liability is sustained by substantial evidence.

Appellant argues that he is 69 years of age and has a wide reputation in Mississippi County for driving fast and powerful racing automobiles, and that the jury was prejudiced by this reputation and by the fact that he left the scene of the accident. We find nothing in the record to indicate such prejudice. Appellant's reputation was not alluded to during the trial, he admitted that he left the scene of the accident, and there is nothing in the record to indicate that the jury was not satisfied with his explanation.

Appellant points out that appellee had had twenty-three childbirths and was not in good health prior to the accident. The appellee's testimony is not disputed that

she was 58 years of age at the time of trial; that the last of her twenty-three childbirths occurred when she was 42 years of age, and that she had never suffered any disability prior to the accident except during the twenty-three childbirths by her first marriage.  Appellee's testimony is uncontradicted that high blood pressure was the only known physical impairment she suffered prior to the accident and that her high blood pressure did not prevent her from picking and chopping cotton in season and earning $5.00 per day at housework during most days of every week prior to the collision. She was regularly employed at general housework for nine months immediately prior to the collision.  Appellee's ability to work at gainful employment prior to the collision is not questioned.

Now, as to appellee's injuries and her physical condition following the collision: Appellee testified that she was knocked down in her automobile and bleeding, she says she was numb, and following the advice of the police, she went to see Dr. Elliott, who was unable to see her that day but told her to return the next day. She then continues:

"Q.  Daisy, what was your condition the day after the accident, as far as how you felt?

A.  I began getting sore and coming back to life. Stayed kind'a numb, felt like I was froze all night.  After he sent me to get x-rays, told me to go home, take the medicine.  I went home, that night I had some kind of a spell.  I thought I was dying.  Looked like something snatching me, taking my breath.  I got scared then.  Up to then I wasn't too worried, till I had the spell.

Q.  What happened when you had the spell?

A.  Looked like I was sick, going to die, breath leaving me.  I sat up late, wondering what

was going to happen.   I said to myself, 'This don't stop, going to die.'   Looked like, cutting my breath off. *I hurt underneath my shoulder blade and my neck was hurting.*

Q.  The night after the collision?

A.  Yes, sir.

Q.  Did you go back to see the doctor?

A.  I took, went to Dr. Utley.

Q.  Went to see Dr. Utley?

A.  Yes, sir.

Q.  Remember what day you went to see Dr. Utley?

A.  I don't know, exactly, what day it was. After I had the spell, still stayed there a day or so before I went to Dr. Utley.

\*   \*   \*

Q.  When did you go to the hospital?

A.  Twenty-seventh.

Q.  Twenty-seventh of August?

A.  Yes.

Q.  How long did you stay in the hospital?

A.  Seventeen days.

Q.  Dr. Utley was your doctor?

A.  Yes, sir.

Q.  Have you continued to see him, up to this time?

A.  Yes, continued to see him.   Off a little while, not long.

Q.  Has he been treating you for this condition?

A.   Yes, sir.

\*   \*   \*

Q.   Have you tried to do any work?

A.   No.  No more than around home.   I couldn't make it at home.

Q.   Have you done work at home?

A.   No.  Did some.   Take the clothes to the washer in the car.   House, just let it went.

Q.   Why can't you work?

A.   *Back hurts, get spells.   It was four weeks ago I had a sick spell.*   Told Dr. Utley, *it knocked me out.*

Q.   What happened?

A.   *Get a burning, small place in my back.*   Go to getting sick.   Spit up a lot of slick stuff. Goes on, *started to get up and fell out.*

Q.   Did you pass out?

A.   No, I didn't pass out.   Fell and laid down on the couch.   Next day I went up and told them I had a spell, went the next day, I couldn't go the day I had the spell.

Q.   *Are you still having pain in your neck?*

A.   *Yes, and back too.*

Q.   Is there pain there all the time?

A.   *In my back, goes and comes.   Have a place hurts right in the middle of my back, what knocks me out.   Right here.*   (Indicating) When he hit me, this side, hurt my back there. This place.   Lay down at night, got a big hard place, when I hit the light pole, *hurts when I lay down at night, pains around my neck when I lay down at night.*

Q. You had to work to live, didn't you, Daisy?

A. *Yes, sir. I worked all the time before I was sick.*

\* \* \*

Q. Do you get any check from the welfare, anything?

A. *No, sir. No, sir.*

Q. Before this accident, had you been sick?

A. *I had a little high blood pressure, didn't bother me much. Picked cotton every fall, chopped cotton in the hot sun. All the sickness I ever had was childbirth, get up and go back to work.*

Q. Did you have trouble with your back, neck, prior to the accident?

A. *No, sir. Neck never did bother me. Bothers all the time now.*

Q. You were able to scrub floors, wash, wax?

A. Yes.

Q. All of this?

A. Yes, I scrubbed the floor and waxed the floors over at Mrs. Baxley's, everything.

Q. Did it bother you?

A. No." (Emphasis supplied).

Doctor Utley testified that he saw appellee on August 24, 1965:

"A . . . *she had muscle spasm in the back, across the low part of her back. We made x-rays of this particular region. X-rays were basically negative. We felt she had received some fair-*

*ly severe back sprain from the accident.* We started her on med-co synlator treatment, *which is physical therapy.* Gave muscle relaxant drugs. Started on a tablet for high blood pressure. We saw her the next two or three days. She hadn't improved, so we had her admitted to Doctor's Hospital on the 27th of August, 1965. *Her admitting diagnosis was lumbar sacral sprain and final diagnosis.* Discharged September 13, 1965.

Q. In the hospital, I believe, approximately 17 days?

A. Approximately, yes, sir.

Q. Did you continue to see her, treat her, while she was in the hospital?

A. Yes, sir.

Q. Doctor, how often would you say you have been seeing her since she came to you August 24th?

A. We saw her up until, there was a period we saw her fairly regularly. Then a period we did not see her. We saw her during September, 1965, saw her about three times. Saw her in October about three or four times. We saw her in November about four times, this was in 1965.

Q. Yes, sir.

A. Then I didn't see the patient again until March, 1966.

Q. When she came back in March, 1966, *was she still suffering, having the same symptoms she complained of before?*

A. *Practically the same complaints, yes.*

Q. Did you find on your examination any improvement in the conditions you found in her when you first saw her?

A. *I would say, slight improvement, yes. But not completely recovered.*

Q. You've been seeing her, more or less regularly, since that time up to this date?

A. That is right.

\* \* \*

Q. Is she still under your care?

A. Yes, sir.

Q. Doctor, what are her complaints at this time?

A. Her complaints at this time vary quite a bit too. *She says she has these pains in her neck and back. Sort of, at times, passing out spells, she gets numb.*

Q. From your, information you have and your examination, has she been able to do any type work since this accident occurred?

A. I don't—this is purely an opinion, but *I assume, she hasn't been able to do any work. This is an opinion, but I assume she has not been able to work from what she told me.*

Q. Doctor, she is still complaining of soreness in the back, right shoulder, neck and down the lower part of her back, still says she becomes kind'a dizzy when she tries to walk, can't get around any, would you say those conditions were caused from this accident?

A. Ah—*I would say that a lot of her complaints were aggravated by the accident.* I couldn't say, positively, caused by the accident. *But, aggravated by the accident.*

Q. She had an arthritic condition prior to the accident?

A. *That is what the x-rays show.*

Q. *And you say that has been aggravated by this accident?*

A. *Yes.*

Q. Do you have anyway to evaluate the percentage of her total disability at this time?

A. No, sir. I don't.

Q. This has been two years and two months. I believe, today is the 19th, yesterday was the 18th, it happened the 18th of August. She has been suffering this way for two years and two months. Assuming she has continued to suffer up to this time. *Having the same kind of symptoms. Do you think she will continue suffering, have a lot of discomfort for a considerable period of time?*

A. *I would think, she would have some trouble. How much would be impossible to say. Yes."*

(Emphasis supplied).

Doctor Field, a neurosurgeon, testified as follows:

"Q. From your examination today, is there some justification in feeling she does still have some pain and discomfort from the accident?

A. Well, I think the only thing I can say, from an anatomical point, *is that she has some arthritis in the lumbar spine, and certainly it is not unreasonable to think she could have some pain and discomfort from it. I could go that far.*

Q. *That would be the result of the accident?*

A. *Yes."* (Emphasis supplied).

We are of the opinion that there was substantial evidence to sustain a jury verdict of $5,000 damage in this case, and that the judgment of the trial court should be affirmed.

Affirmed.